

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-26-00083-CV

———————————————

IN THE INTEREST OF A.M., J.M., AND K.W., CHILDREN

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 324-751165-24

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant J.A. (Mother) challenges the termination of her parental rights to three of her children: A.M. (Amy), J.M. (John), and K.W. (Kim).[1] Mother argues that the evidence was neither legally nor factually sufficient to support the trial court's termination findings (1) that she, among other things, endangered the children by her course of conduct, and (2) that termination was in the children's best interest. But the evidence showed that Mother had a near-decade-long pattern of not only dating abusive men but also downplaying their violent actions—even after an ex-boyfriend killed one of her children. Because this evidence was sufficient to support the trial court's findings, we will affirm.

## I. Background

The evidence at Mother's termination bench trial showed that she had been in a series of relationships with violent men since before the children were born.

- In approximately 2016 and 2017, Mother dated Amy's father, D.M. (First Boyfriend). Although Mother later claimed that First Boyfriend never "physically" beat her, she admitted that they "had altercations." And just a few months after Amy was born in mid-2017, First Boyfriend pleaded guilty to misdemeanor assault family violence for hitting Mother.[2]

- In 2018 and 2019, Mother dated John's father, J.M. (Second Boyfriend). While they were living together, Second Boyfriend violently beat Mother and left

---

[1]At the time of trial, Amy was 8, John was 6, and Kim was between 3 and 4.

[2]First Boyfriend was also convicted of misdemeanor assault for hitting Mother's sister around the same time.

visible injuries. At trial, Mother acknowledged that Amy and John[3] had been "in close vicinity when [Second Boyfriend] was beating [her]," and she further admitted that Second Boyfriend had assaulted her "[m]any" other times during their relationship. Second Boyfriend was ultimately convicted of misdemeanor assault family violence for "kicking, . . . striking, grabbing, or pushing" Mother. [Formatting altered.]

- After Mother and Second Boyfriend broke up, she attempted to pick up Amy and John from a mutual friend's home, and Second Boyfriend pulled a gun on her outside the house while the children were steps away inside.

- By 2020, Mother had begun dating S.N. (Third Boyfriend). Mother later admitted that she "had heard things" about Third Boyfriend being a violent, "dangerous person" and that he "was disciplining the kids behind [her] back." But Mother insisted that she "was never shown any proof" of Third Boyfriend's violence and that she had no way of knowing that he would turn out to be a murderer.

- After Mother and Third Boyfriend broke up,[4] Mother had two additional children: Z.A. (Zack)—who later died, and is thus not a party to this case—and Kim. Mother later explained that Kim's father was "a one-night stand . . . in Las Vegas" and that she "ha[d] no way of knowing" who the man was.

- In 2024, even though Mother and Third Boyfriend had broken up, Third Boyfriend continued living with Mother's mom (Grandmother).[5] And Mother routinely left her children at Grandmother's home for extended periods of time, knowing that Third Boyfriend lived there.[6] Then, one day, while the

---

[3]John was born in 2019 before the incident.

[4]There was conflicting testimony regarding when Mother and Third Boyfriend broke up. A Department investigator recalled Mother giving an end date in 2020, a caseworker recalled her identifying an end date in 2022, and Mother testified to an end date in 2021.

[5]There was evidence that Grandmother was living in a hotel at the time.

[6]A Department caseworker testified that, according to the children, they lived with Grandmother. But according to Mother, her children spent about half their time at Grandmother's home due to Mother's overnight work schedule. She later

children were staying with Grandmother—and Third Boyfriend—Third Boyfriend murdered then-three-year-old Zack.

- When Zack died, he had bruises all over his body, and the surviving children—Amy, John, and Kim—exhibited bruises as well. Amy, John, and Kim were removed from Mother's care.

- At the time of the children's removal in May 2024, Mother was dating D.W. (Fourth Boyfriend), who again, was abusive. Yet, even after Zack's death and the children's removal, Mother remained in her abusive relationship with Fourth Boyfriend.

- In July 2024, while Mother was pregnant with Fourth Boyfriend's child,[7] Fourth Boyfriend choked her and punched her in the stomach. But when a Department caseworker asked Mother about Fourth Boyfriend a few months later, she stated that "there[ had] been no domestic violence between [them]."

- Then, in September 2024, Mother began a relationship with M.T. (Fifth Boyfriend).[8] During their relationship—which continued for more than a year, through the start of the termination trial—Fifth Boyfriend "kicked [Mother], punched [her], bit [her], held a gun to [her]," and "held [her] hostage," among other things.

- In August 2025, Fifth Boyfriend confronted Mother at the door to her apartment, accused her of cheating, dragged her by her dress into the apartment, beat her with a cord, prevented her from accessing her phone to call for help, held a loaded gun to her head, and threatened to kill her.[9] But just

---

explained that, at the time, she worked for "a temp service" that sent her out to "various jobs" in the "medical" field.

[7]Mother testified that she later decided to terminate the pregnancy.

[8]In July 2025, Mother gave birth to Fifth Boyfriend's child: M.D.T. (Mike). Mother's parental rights to Mike were not adjudicated as part of this case and are instead the basis of a companion case.

[9]After Mother escaped to a local gas station and called the police, they arrested Fifth Boyfriend and searched Mother's apartment. Under a couch cushion, the police found the weapon that Mother had described—a loaded miniature AK-47 with an extended magazine and a live round in the chamber.

one day later, Mother pretended that Fifth Boyfriend's assault had never happened, telling a Department caseworker that it had been months since the last incident of domestic violence between her and Fifth Boyfriend.

- Although Fifth Boyfriend was arrested for assaulting Mother and prohibited from "[c]ommunicating [with her] in any manner,"[10] Mother continued communicating with him while he was in jail, telling him that she "loved him" and "wanted to make the relationship work."

When the termination trial began in November 2025, First Boyfriend was in prison for robbery causing bodily injury (following earlier misdemeanor convictions for assaulting Mother and her sister); Second Boyfriend was in prison for a drug-related offense (following a prior misdemeanor conviction for assaulting Mother); Third Boyfriend was in jail awaiting trial for Zack's murder; Fourth Boyfriend was in prison for his 2024 assault on Mother; and Fifth Boyfriend was in jail awaiting trial for, among other things, his 2025 assault on Mother. Yet, Mother was still in contact with Fifth Boyfriend and was still downplaying her other boyfriends' violence.

But her attitude changed as the trial progressed. The trial testimony was spaced out over several months, and by the time Mother testified in February 2026, she had begun to change.

Mother explained that, in recent weeks, she had stopped communicating with Fifth Boyfriend, had begun domestic violence classes, had taken trauma-related

---

[10]The protective order prohibiting Fifth Boyfriend from communicating with Mother provided, in bold capital letters, that "no person, including a person who is protected by this order, may give permission to anyone to ignore or violate [it]." [Formatting altered.]

intervention training, and had implemented a safety plan in case of future domestic-violence-related emergencies.

But Mother admitted that her life was still unstable. She had been arrested at least four times while the termination case was pending,[11] including on the day she was originally scheduled to testify. And when Mother testified on the rescheduled trial date, she acknowledged that her recent arrest had been for driving without a valid license[12] and that, in fact, she had been driving without a valid license for years—including while the children were in her care.[13]

Mother further admitted that she had worked as a prostitute in 2025 while the termination case was pending.[14] And although she insisted that her stint as a prostitute had been short-lived, she acknowledged that some of her advertisements

---

[11]Although the record is ambiguous regarding the reasons for Mother's arrests, she claimed that one of her arrests had been for failing to give accurate identification to law enforcement and that the other three arrests stemmed from her failures to respond to prior tickets or appear at scheduled court hearings.

[12]Mother testified that she had received a ticket for driving without a license and that "they had [her] sit out [the ticket] that day."

[13]Mother stated that she had "never had a valid driver's license."

[14]There was also evidence that, during one of Mother's arrests in 2025, she told a law enforcement officer that she worked as a "dancer" and that such work was how she had earned the large quantity of $1 bills in her purse. But when Mother testified, she explained the $1 bills by saying that she had been hired to dance—clothed—at "a bachelorette party" and that "they were just throwing money at the party."

6

might still be posted online,[15] and a family friend testified that Mother had been posting prostitution advertisements on Facebook for years.

In addition to Mother's concerning employment history, she admitted that she did not have a physical home to offer the children. She had lived in various locations during the case's pendency, bouncing from a hotel to Grandmother's home to an apartment. At the time of trial, Mother had been evicted from her apartment and was living with Grandmother again.

After hearing this and other evidence, the trial court found that (1) Mother had, among other things, "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being,"[16] and (2) termination was "in the children's best interest."[17] *See* Tex. Fam. Code § 161.001(b)(1)(E), (2).

## II. Discussion

A trial court may terminate a parent–child relationship if it finds clear and convincing evidence (1) that the parent committed at least one statutorily delineated

---

[15]Mother explained that the advertisements "never come down, they stay up" and that only the website host—not Mother—has the ability to remove them.

[16]The trial court also found that Mother had "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being." *See* Tex. Fam. Code § 161.001(b)(1)(D).

[17]The trial court also terminated the parental rights of each child's father, but none of the fathers have appealed.

predicate act, such as "engag[ing] in conduct or knowingly plac[ing] the children with persons who engage[] in conduct which endanger[s] the[ir] physical or emotional well-being," and (2) that termination is in the children's best interest. *See id.*; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). Mother challenges the legal and factual sufficiency of these termination findings.

## A. Standard of Review

When an appellant challenges the legal and factual sufficiency of a trial court's termination findings, we assess whether a reasonable factfinder could have formed a firm belief or conviction that the challenged findings were true. *A.C.*, 560 S.W.3d at 630–31; *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). Both legal and factual sufficiency turn on this question; the distinction between the two "lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630–31.

For legal sufficiency, we view the evidence in a light most favorable to the challenged finding, and for factual sufficiency, we consider the disputed evidence that a reasonable factfinder could not have credited in favor of the finding and weigh its significance in light of the entire record. *Id.* at 631; *A.B.*, 437 S.W.3d at 502–03; *In re P.P.-S.*, No. 02-23-00309-CV, 2024 WL 123654, at *4 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.) (mem. op.). Neither sufficiency analysis allows us to supplant the factfinder's credibility determinations with our own, though. *In re J.D.*, No. 02-24-00404-CV, 2025 WL 52128, at *10 (Tex. App.—Fort Worth Jan. 9, 2025, no pet.)

8

(mem. op.). The factfinder—here, the trial court—remains the sole judge of the witnesses' credibility. *Id.*; *P.P.-S.*, 2024 WL 123654, at *4.

## B. Endangerment Finding[18]

Mother first challenges the legal and factual sufficiency of the evidence to support the trial court's predicate finding of conduct-based endangerment, i.e., its finding that she "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being." *See* Tex. Fam. Code § 161.001(b)(1)(E).

### 1. Law on Conduct-Based Endangerment

To support a trial court's finding of conduct-based endangerment, the evidence must demonstrate that the parent engaged in a "voluntary, deliberate, and conscious course of conduct" that "jeopardize[d]" the children's well-being or "expose[d] the child[ren] to loss or injury." *E.A.*, 2025 WL 1085189, at *8–9; *J.D.*, 2025 WL 52128, at *11; *see In re E.K.H.*, No. 09-21-00376-CV, 2022 WL 1037766, at *9 n.46 (Tex. App.—Beaumont Apr. 7, 2022, no pet.) (mem. op.); *In re E.A.G.*, No. 14-01-01046-CV, 2002 WL 31525633, at *3 (Tex. App.—Houston [14th Dist.] Nov. 14, 2002, no pet.) (not designated for publication). Because this finding requires a "course of

---

[18]Mother challenges the sufficiency of the evidence to support the trial court's other predicate finding as well, but because a trial court's termination judgment may be sustained on just one predicate finding, we need not address Mother's challenge to the other finding. *See* Tex. R. App. P. 47.1; *In re E.A.*, No. 02-24-00535-CV, 2025 WL 1085189, at *1 (Tex. App.—Fort Worth Apr. 10, 2025, pet. denied) (mem. op.).

conduct" rather than a "single act or omission," the factfinder may consider "actions before the child[ren]'s birth[s], actions while the child[ren are] not in the parent's presence," and actions that are not "directed towards the child[ren]." *J.D.*, 2025 WL 52128, at \*11; *E.A.G.*, 2002 WL 31525633, at \*3; *see E.A.*, 2025 WL 1085189, at \*8–10.

### 2. Evidence of Conduct-Based Endangerment

Mother argues that her relationships with violent men did not amount to conduct-based endangerment because (1) "there [wa]s no evidence that the children were present during the[] incidents" of domestic abuse and (2) she "was the victim, not the perpetrator." But these arguments are not only (1) legally and factually inaccurate but also (2) representative of Mother's problematic mindset.

First, "[t]he factfinder may consider domestic violence . . . as evidence of endangerment, even if the violence did not occur in the children's presence, was not directed at the children, or did not physically injure the children." *E.A.*, 2025 WL 1085189, at \*9–10 (affirming endangerment findings based in part on evidence of domestic violence); *see E.A.G.*, 2002 WL 31525633, at \*5 (explaining that the trial court could consider abuse of other relatives or children in conduct-based endangerment analysis "even if the child [at issue] was not always present"). Thus, Mother's "history of involving herself in relationships with violent men" could constitute an endangering course of conduct even if the children had never been present to witness the abuse. *In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at

10

*10 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.) (affirming endangerment findings in part based on evidence of domestic violence); *see P.P.-S.*, 2024 WL 123654, at *5 (reiterating that "[e]vidence that a parent 'exposed her children to domestic violence' may also support a finding of [conduct-based] endangerment").

But the record reflects that Amy, John, and Kim were, in fact, present for some of the domestic violence incidents. Mother acknowledged that, when Second Boyfriend assaulted her in 2019, Amy and John were in the vicinity. And it is undisputed that, when Third Boyfriend murdered Zack at Grandmother's home in 2024, Amy, John, and Kim were at the home as well. *See E.A.G.*, 2002 WL 31525633, at *5 (noting that "violent acts directed towards one child can endanger other children not the direct victims of the physical abuse in question"). Indeed, a Department caseworker indicated that, when Zack died, the surviving children exhibited bruises indicative of abuse and that "they opened up to [the caseworker] and told [her] what was going on" the first time she met them.

Mother's failure to acknowledge this evidence dovetails with her second argument—and is symptomatic of her larger issue. Mother asserts that she "was the victim, not the perpetrator" and insists that she should not be faulted for her "status as a victim of domestic violence." But while Mother may have started as a victim, at some point she became a volunteer.

11

No doubt Mother was a victim of violence, but she was also an adult—an adult mother with the responsibility of protecting her children. *See E.A.*, 2025 WL 1085189, at \*14 (rejecting similar argument in analysis of children's best interest and explaining that "[a] reasonable factfinder . . . could wholly agree with [m]other that she was the victim of [f]ather's domestic violence but fault her for remaining with [f]ather"); *In re C.H.*, No. 10-23-00402-CV, 2024 WL 2862135, at \*3 (Tex. App.—Waco June 6, 2024, no pet.) (mem. op.) (rejecting similar argument in analysis of children's best interest and explaining that, while mother might be a victim, the "children were victims as well," and mother "[wa]s an adult who was responsible for the[ir] physical and emotional well-being"); *P.P.-S.*, 2024 WL 123654, at \*6–7 (rejecting similar argument that mother "was the victim of [f]ather's violence" and explaining that, "[w]hile this may be true, [m]other took deliberate actions to maintain contact with [f]ather"). Rather than recognizing and fulfilling her parental responsibilities, the evidence showed that Mother chose to expose herself—and her children—to a series of violent men while turning a blind eye to the threats those men posed to her children:

- In mid-2019, Mother chose to have a romantic relationship with Second Boyfriend and to allow him to live with her and her children. Amy and John were directly exposed to Second Boyfriend's violence when he beat Mother while the children were nearby.

12

- From 2020 to 2021, Mother chose to date Third Boyfriend, despite hearing warnings that he was violent. Rather than acknowledging the threat he posed,[19] Mother chose to leave her children at Grandmother's home while Third Boyfriend lived there, directly exposing the children to a violent man who ultimately killed her son Zack.

- In 2024, Mother chose to bring another abusive man into her and her children's lives: Fourth Boyfriend. And even after Amy, John, and Kim were removed from Mother's care, she chose to continue her abusive relationship with Fourth Boyfriend.

- Later, when Mother became pregnant, she chose to expose her unborn baby to Fourth Boyfriend's violence. Fourth Boyfriend punched Mother in her stomach and "strangled her," yet when a Department representative asked her about the assault, Mother downplayed it.

- Mother then chose to begin a relationship with yet another abusive man: Fifth Boyfriend. Within days of Fifth Boyfriend's violently beating Mother, holding a gun to her head, and threatening to kill her, she told a Department caseworker that she had not been the victim of any domestic violence for several months, showing no recognition of the threat that he posed.

- Even after the termination trial began—as Mother urged the trial court to find that her conduct did not endanger her children—she continued telling Fifth Boyfriend that she "wanted to make the relationship work."

This evidence demonstrated that Mother repeatedly and voluntarily engaged in violent relationships all the while ignoring the jeopardy that these relationships posed to her children's well-being. *See E.A.*, 2025 WL 1085189, at *10 (affirming endangerment findings based in part on evidence of continued relationship with

---

[19]On appeal, Mother repeatedly refers to Third Boyfriend's murder of Zack as "unforeseeable," asserting that there was no evidence that she knew Third Boyfriend was violent. But Mother admitted that she had been warned that Third Boyfriend was violent, and a Department caseworker testified that, at the time of Zack's death, Amy, John, and Kim exhibited visible bruises suggestive of physical abuse.

domestic abuser and explaining that "[a]lthough aware of [f]ather's violence, [m]other continued to expose herself to it and would expose the children to it"); *E.A.G.*, 2002 WL 31525633, at *5 (noting that parents' attempt "to conceal their history of [mutual] domestic abuse" was "evidence of an unwillingness to take responsibility and ensure the child's future safety"). And evidence that a parent has consistently "exposed her children to domestic violence may . . . support a finding of [conduct-based] endangerment . . . [—]even [though] the parent is the victim of the domestic violence[—]when that parent continues to expose the children to the violence and does not take affirmative steps to eliminate the potential harm to the children." *C.H.*, 2024 WL 2862135, at *1–2 (affirming conduct-based endangerment finding based in part on mother's pattern of exposing children to domestic violence); *cf. In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *11–12 (Tex. App.—Fort Worth Dec. 22, 2011, pet. denied) (mem. op.) (holding evidence of domestic violence insufficient to support conduct-based endangerment finding when mother did not continue the relationship with her abuser and "took precautions to protect herself").

Here, such evidence—whether viewed in a light most favorable to the endangerment finding or weighed in the context of the record as a whole—allowed the trial court to reasonably form a firm belief or conviction that Mother engaged in a deliberate course of conduct that endangered her children's well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E); *P.P.-S.*, 2024 WL 123654, at *6–7 (affirming conduct-based endangerment finding and explaining that "[m]other deliberately exposed the children

14

to domestic violence in the home and . . . failed to protect [them] from [f]ather's violence"); *E.A.G.*, 2002 WL 31525633, at *5 (affirming conduct-based endangerment finding based in part on mother's "history of domestic violence[ and] her misleading statements designed to mitigate that history"); *E.K.H.*, 2022 WL 1037766, at *7–9 (affirming conduct-based endangerment finding based in part on evidence of "an ongoing pattern of domestic violence, a pattern [m]other was contributing to by ignoring and creating a danger to [the child's] physical safety and emotional well-being"). In other words, the evidence was legally and factually sufficient to support the trial court's predicate finding of conduct-based endangerment. *See* Tex. Fam. Code § 161.001(b)(1)(E).

We overrule this issue.

## C. Best Interest Finding

Mother next challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. *See id.* § 161.001(b)(2).

### 1. Law on Best Interest

In assessing the children's best interest, the "paramount" consideration is their need for a safe, stable, permanent home. *E.A.*, 2025 WL 1085189, at *12–13; *see A.C.*, 560 S.W.3d at 631 (noting that the best interest inquiry "is child-centered and focuses on the child's well-being, safety, and development"); *E.K.H.*, 2022 WL 1037766, at *9 (noting presumption that "the prompt and permanent placement of

15

the child in a safe environment is . . . in the child's best interest"). Although we presume that it is in the children's best interest to keep them with their mother, *see E.A.*, 2025 WL 1085189, at *11, we consider other factors as well, including (1) the emotional and physical danger to the children; (2) the mother's parental abilities; (3) the acts or omissions of the mother that indicate an improper parent–child relationship and the excuses given for those acts or omissions; (4) the children's emotional and physical needs; and (5) the overall stability—or instability—of the mother's home.[20] *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *E.A.*, 2025 WL 1085189, at *11.

### 2. Evidence of Best Interest

Mother argues that termination was not in the children's best interest because she had taken steps to protect her children and to improve her parental abilities. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the parent's parental abilities and the programs available to assist the parent). She notes that, as the termination trial progressed, she cut off communication with Fifth Boyfriend, participated in domestic violence classes, took trauma-intervention training, and implemented a safety plan. But such efforts were measured in weeks, compared to Mother's concerning pattern of conduct, which was measured in years. *See In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12,

---

[20]These factors are neither exhaustive nor exclusive. *E.A.*, 2025 WL 1085189, at *11.

2019, pet. denied) (mem. op.) (noting in best interest analysis that parent's recent participation in self-improvement programs was "commendable" but that it "reflect[ed] only four weeks in a forty-three-year lifetime").

As previously discussed, the evidence showed that Mother consistently invited violent men into her children's lives while failing to acknowledge the threat those men posed—much less to protect her children from that threat. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the danger to the children, the parent's acts or omissions that indicate an improper parent–child relationship, and the parent's excuses for the acts or omissions); *In re O.E.R.*, 573 S.W.3d 896, 908 (Tex. App.—El Paso 2019, no pet.) (reviewing best interest finding and concluding that because the mother "exposed the children to a harmful and unstable home environment by repeatedly engaging in relationships with men who engaged in domestic violence against her[,] . . . the trial court could have found that the existing parent–child relationship between [her] and the children [wa]s not a proper one"); *E.A.G.*, 2002 WL 31525633, at *6 (reiterating that "the child's best interest [is] served by being free of an environment of domestic violence"). "The children needed a safe and stable home and a mother who did not allow a violent person into the home." *P.P.-S.*, 2024 WL 123654, at *8 (affirming best interest finding in case involving domestic violence and noting that "[t]he domestic violence in [m]other's home created both emotional and physical risks for the children"). This near-decade-long pattern of conduct not only jeopardized the children's physical safety and emotional well-being but also

reflected poorly on Mother's parental abilities by demonstrating her unwillingness to take the steps necessary to protect them. *Cf. Holley*, 544 S.W.2d at 371–72 (listing parental abilities as best interest factor); *E.A.*, 2025 WL 1085189, at *15 (noting in best interest analysis that mother's "remaining with [f]ather despite the domestic abuse . . . reflected poorly on her parental abilities"); *P.P.-S.*, 2024 WL 123654, at *8 (noting in best interest analysis that mother lacked parental abilities because, though she "appeared to be concerned about the domestic violence happening in front of the children, she was 'not concerned enough to make [the father] leave'"); *O.E.R.*, 573 S.W.3d at 908 (concluding in best interest analysis that the evidence showed the mother had "poor parenting skills" when "she failed to protect the children from domestic violence or provide them with a safe home environment"). Despite Mother's eleventh-hour efforts to change, a reasonable factfinder could nonetheless have inferred that Mother's established pattern of unprotective conduct would continue. *See R.H.*, 2019 WL 6767804, at *5 ("A fact[]finder may measure a parent's future conduct by h[er] past conduct and determine that it is in a child's best interest to terminate h[er] parental rights."); *O.E.R.*, 573 S.W.3d at 907 ("A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent."); *E.A.G.*, 2002 WL 31525633, at *8 (affirming best interest finding in case involving parents' mutual domestic violence and noting that "the trial court did not have to accept as true the mother's testimony of her future intentions or recent alterations in lifestyle").

18

In addition, there was evidence of Mother's inability to provide for her children's basic physical needs. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the children's physical needs and the parent's plans for the children). She had lived in various locations since the children's removal, and at the time of trial, she was living with Grandmother. *See C.H.*, 2024 WL 2862135, at *3 (noting in best interest analysis that parents "had lived in multiple locations . . . throughout the proceedings" and "were not in a position to have the children returned to them"); *O.E.R.*, 573 S.W.3d at 908 (noting in best interest analysis that the mother's "plan for the children to be returned to her [wa]s not realistic in part because she was . . . living with her grandparents at the time of trial"). Mother herself admitted that she did not have a safe, stable home to offer the children. *See E.A.G.*, 2002 WL 31525633, at *7 (affirming best interest finding in case involving parents' mutual domestic violence and emphasizing "[t]he need for permanence" and "the goal of establishing a stable, permanent home for a child" as "paramount"). And "[c]hildren need permanency and stability." *In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.); *see O.E.R.*, 573 S.W.3d at 907 ("[P]ermanence is of paramount importance in considering a child's present and future needs.").

The evidence raised questions regarding Mother's source of income as well. She admitted having worked as a prostitute in the past—including while the termination case was pending—and although she claimed that she had stopped such

work, she acknowledged that the advertisements for her services remained online. *Cf. C.H.*, 2024 WL 2862135, at *3 (noting in best interest analysis that parents "had various jobs throughout the proceedings"); *P.P.-S.*, 2024 WL 123654, at *8 (noting in best interest analysis that mother provided "no proof of employment" to show that "she could provide the children with permanency and stability"); *O.E.R.*, 573 S.W.3d at 908 (considering mother's employment as part of best interest analysis and describing mother's "plan for the children to be returned to her [wa]s not realistic in part because she was unemployed").

In addition, there was evidence that she had routinely exposed herself to the risk of arrest by engaging in other illegal behavior as well. *See Holley*, 544 S.W.2d at 371–72 (listing best interest factors including the stability of the parent's home); *E.A.*, 2025 WL 1085189, at *18 (noting in best interest analysis that the father had "compromised his availability to parent the children when his conduct resulted in a new felony indictment"). Mother was arrested at least four times while the termination case was pending, and she admitted that she had been driving without a valid driver's license for years—including when the children were in her care. Even at the time of trial, Mother still did not have a valid license. And when she was asked "what [would] happen[] to these kids if suddenly they're with [her] and [she] g[o]t arrested," she acknowledged that the Department might "[p]ossibly" have to come retrieve them, exposing them to further instability.

20

Meanwhile, the trial court heard evidence of two potential stable placements for the children.[21] Both placements would allow all of the children to live together, both agreed to care for the children long-term, and one was interested in adoption.

Taking all of this evidence together—the evidence of Mother's pattern of endangering the children, lack of protective parental abilities, unstable housing, questionable employment, and consistent arrests—a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. Tex. Fam. Code § 161.001(b)(2). Whether we view the record in a light most favorable to the judgment or consider it as a whole, the evidence was sufficient to support the trial court's best interest finding. *See id.*

We overrule Mother's final issue.

---

[21]One of the potential placements was a friend of Mother's who had cared for the children for extended periods of time both before and during the case's pendency. However, the children were removed from the friend's care and she lost her foster license due to allegations of misconduct. Although there was evidence that the allegations of misconduct had been either remedied or ruled out by the time of trial, both the Department and the children's ad litem expressed concerns regarding other alleged misconduct and potential financial strains. When the trial court announced its ruling at the end of the termination trial, it indicated that the Department could review the options and place the children "as [it] s[aw] fit."

### III.  Conclusion

Because the evidence was sufficient to support the trial court's termination findings, we affirm the termination judgment.  *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  June 4, 2026